**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC JETSON LYONS, | ) | |
| Petitioner, | ) | Civil Action No. 07-214 Erie |
| | ) | |
| v. | ) | |
| | ) | District Judge McLaughlin |
| SUPERINTENDENT WILSON, et al., | ) | Magistrate Judge Baxter |
| Respondents. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

### II.    REPORT

#### A.    Relevant Background[1]

This case involves the kidnapping, rape, and attempted murder of an eight-year-old girl, "M.R."  The crimes against her were committed on the night of February 15, 2001, when a male intruder entered her family's home on Myrtle Street in Erie, Pennsylvania, sometime before 9:00 p.m.  M.R. was asleep in her bedroom.  The intruder woke her up, held a knife to her throat, and carried her out of the home and into his car.  He drove her to a second location, where he raped her and assaulted her in many ways, and then told her that he was going to kill her.  Using a strip of cloth that he had torn from a blanket, the man strangled M.R. and bound her limbs.  He dumped her in a snowbank near a trucking company, leaving her to die.  Somehow M.R. survived the horrific attack.  When she regained consciousness she was unable to walk due to her injuries.  She crawled to a fence, where Joseph Nason and Brett King, who worked with the trucking company, heard her screaming around 1:15 a.m. on February 16, 2001.  M.R. told King

---

[1]  Respondents have submitted the original State Court Record ("SCR") and all relevant transcripts.  The SCR contains 161 documents and shall be cited to as "SCR No. __ ."

that "he brought me here."  (Day Two Trial Tr. at 135, 146).

M.R. was rushed by ambulance to St. Vincent Hospital.  Ruth Seaburg, R.N., performed the rape kit on M.R. and removed a partial Negroid hair from her underwear.  M.R. provided some details about what happened to her and said that her abductor was a black male with a beard.  (Id. at 162).  Erie Police Officer Margaret Kuhn interviewed M.R. briefly that morning, before she went into surgery.  M.R. gave Officer Kuhn a general description of her abduction and strangulation.  (Day One Trial Tr. at 31-39).  She said her abductor's car had four doors and looked bluish in color, and that he was a tall, light-skinned black man.  (Id. at 46-47).  He told M.R. that he had been watching her through a window and that he was 37 years old (which was Petitioner's age at the time).  (Id. at 33-35).  M.R. said she did not know her abductor.  (Id. at 46).

M.R. underwent emergency surgery to reconstruct her badly damaged vagina and anus.  Complications required her to be transferred to Children's Hospital in Pittsburgh, where she received further treatment for her injuries.  Those injuries included a collapsed lung, impaired motor skills, and brain damage.  Officer Kuhn interviewed M.R. in person at Children's Hospital on February 17th, and over the phone on February 18, 2001.  M.R. said that her abductor held a knife to her throat.  (Id. at 50-51).  She described him as a "medium" colored black man with straight head hair and hair on his face below and above his lip.  (Id. at 56-58).  She said he was wearing a sweatshirt with gray sleeves and a blue front.  (Id. at 84).  Officer Kuhn showed M.R. a picture of Petitioner's four-door 1994 Buick LeSabre and she identified it as her abductor's car.  (Id. at 58-59).  M.R. also described some items that she had seen in the car.  (Id. at 53).

On February 19, 2001, FBI Special Agent Gene O'Donnell prepared a composite sketch from M.R.'s description of her abductor.  FBI Special Agent Denis Valentine interviewed her and she told him that her abductor wore green sweat pants underneath lighter pants.  (Day Two Trial Tr. at 107).  The police showed the composite sketch to Okey Lawrence, who said it looked like the man he saw peeping into a neighbor's window on Walnut Street (which is three blocks from M.R.'s house) on February 6, 2001.  (Day Five Trial Tr. at 10-15, 256-75).  The man Lawrence saw that night was in close proximity to a red Cavalier with a Pennsylvania registration of

2

DJN9099.  The police traced that car to Petitioner, who owned it and the Buick LeSabre.  (Id. at 18).

When the composite sketch was released to the public, several people called the police and said it looked like Petitioner.  The police put him under surveillance.  On February 22, 2001, they interviewed his work supervisor, who said that he was scheduled to report to work at 11:30 p.m. on February 15, 2001, but was about fifteen minutes late.  Petitioner told his supervisor that he was late because he took a different way to work.  (Id. at 188-190).  He told a coworker that he was late because he had a seizure.  (Id. at 210).  When the police interviewed Petitioner on February 22, 2001, he first said that he was late because his engine light came on, and then said he could not remember what caused his tardiness.  Later in the interview, he said he was late because he was sleeping for several hours at his friend Eric Lomax's house and had overslept.  (Id. at 131-34).  Petitioner gave an entirely different explanation when he testified at trial.

The police found boot prints outside M.R.'s residence and in the area near the trucking company where M.R. was found.  On February 22, 2001, they removed Petitioner's boots from him via a search warrant and determined that those boots matched the prints found at the scenes of the crimes.  (Day Three Trial Tr. at 154, 194-204).  When Petitioner was at the hospital in order to comply with a search warrant for blood and hair samples, he was observed wearing green sweat pants underneath his outer pants.  (Day Three Trial Tr. at 152; Day Four Trial Tr. at 96-98).  The police also searched Petitioner's Buick LeSabre and recovered from it some items that M.R. would later identify as having been in her abductor's car.  The police also recovered from the car pornographic magazines, four knives, condoms, and several pairs of children's underpants.

The police arrested Petitioner on February 23, 2001, and charged him with fifteen crimes related to the kidnapping, rape, and attempted murder of M.R.  The trial court appointed Mark W. Richmond, Esq., and Elvage G. Murphy, Esq., to be his counsel.  They represented him until around August 22, 2001, through disposition of an omnibus pretrial motion.  After that, Petitioner voluntarily dismissed counsel and exercised his constitutional right to represent

himself.  (See 8/22/01 Waiver of Counsel Hr'g Tr.).

M.R. spent approximately ten days at Children's Hospital.  From there, she was transferred to HealthSouth Rehabilitation Center in Erie, where she began a lengthy stay to receive continued treatment and rehabilitation.  She entered therapy with a psychologist, Dr. Judy Smith.  Over the course of the many months of therapy, M.R. revealed details of her attack to Dr. Smith.  Sometimes M.R.'s mother "D.G." would sit in on the therapy sessions and hear the details.  (Day Two Trial Tr. at 55-58).

M.R. also provided additional details of her attack to Lt. Joseph Emerick, who interviewed her on March 6 and April 4, 2001.  During one interview, Lt. Emerick showed M.R. several photographs of items seized from Petitioner's car, as well as pictures of a coffee mug and of clothing seized from Petitioner's sister Dierdra Lyons's home.  (Day Four Trial Tr. at 125). M.R. identified a brandy bottle and the coffee mug as having been in her abductor's car, and said that a sweatshirt taken from Dierdra Lyons's  house was the one her abductor had been wearing. (Day Four Trial Tr. at 128-43; Day Five Trial Tr. at 5-9).  During the April 4, 2001, interview, Lt. Emerick presented M.R. with a six-person photo line-up containing a picture of Petitioner. When asked if she recognized her abductor in any of the photographs, M.R. replied, "I don't know" and said she did not "want to put the wrong person in jail."  (Day Five Trial Tr. at 8-9; see also Day Two Trial Tr. at 73-75, 81-85).

M.R. discussed details of her abduction and rape with D.G.  Once, after M.R. was well enough to live at home, D.G. was in the kitchen when a very upset M.R. entered and asked her "what rape was" because someone from the neighborhood had mentioned it to her.  After D.G. explained to her what the term meant, M.R. said "that's what he did to me."  (Day Two Trial Tr. at 35-36, 53-54).  On an earlier occasion in March 2001, M.R. identified Petitioner during an excited utterance.  She was in the HealthSouth recreation room with D.G.  The television in the room was on and it just so happened that a video of Petitioner came onto the screen during the news.  When M.R. saw the image of Petitioner, she became hysterical and screamed that D.G. had lied to her when she had said "he was in jail."  M.R. was so terrified she tried to crawl under

a table, but was unable to get out of her wheelchair.  At trial, D.G. identified Petitioner as the man whose image was on the television.  (Id. at 24-27).

A little more than a month before Petitioner's trial, on October 3, 2001, the Commonwealth filed an *Amended Notice of Intention to Offer Tender Years Testimony Pursuant to 42 Pa.C.S. § 5985.1.*  (SCR No. 55).  It explained that it intended to call at trial D.G., Officer Kuhn, Lt. Emerick, Dr. Smith, FBI Agent Valentine, Nason,  King, and Nurse Seaburg to testify about statements that M.R. had made to him/her.  The Commonwealth asked the trial court to make a pretrial ruling on the admissibility of each witness' testimony under Pennsylvania's Tender Years Statute, which provides for an exception to the hearsay rule.  For the Tender Years Statute to apply, the court must find that the child victim is unavailable to testify and that the statements sought to be introduced are relevant and have sufficient indicia of reliability.  At that time, the Tenders Years Statute provided:

**Admissibility of certain statements**

**(a) General rule.** – An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing physical abuse, indecent contact or any of the offenses enumerated in 18 Pa.C.S. Ch. 31 (relating to sexual offenses) performed with or on the child by another, not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(1)   the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2)   the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

**(a.1) Emotional distress –** Before the court makes a finding under subsection (a)(2)(ii), the court must determine, based on evidence presented to it, that testimony by the child as a witness will result in the child suffering serious emotional distress such that the child cannot reasonably communicate.  In making this determination, the court may do all of the following:

(1)   Observe and question the child victim or child material witness, either inside or outside the courtroom.

(2)   Hear testimony of a parent or custodian or any other person, such as a person who has dealt with the child victim or child material witness in

a medical or therapeutic setting.

42 PA.CONS.STAT.ANN. § 5985.1 (West 2001).

The trial court held a Tender Years Hearing on November 2, 2001.  Dr. Smith testified as an expert in child psychology.  She stated that M.R. suffered from post-traumatic stress disorder, became extremely upset and overwhelmed when discussing her attack, and "shuts down."  (11/2/01 Tender Years Hr'g Tr. at 102-06).  Dr. Smith explained that she and the Assistant District Attorney attempted to prepare M.R. in the event she would be required to testify at trial, and to that end brought her to the courtroom so she could familiarize herself with the surroundings.  M.R. did not react well to being in the courtroom environment, and Dr. Smith stated that she believed that requiring her to testify would cause her such serious emotional distress that she would not be able to communicate on the witness stand.  (Id. at 113-17).

The trial court determined that M.R.'s statements to the eight witnesses identified by the Commonwealth were relevant and sufficiently reliable and that, if forced to testify, she would suffer serious emotional distress that would cause her to be unable to reasonably communicate. Accordingly, the trial court held that each of the witnesses could testify as to the out-of-court statements M.R. had made to him/her.  (11/5/01 Tr. at 2; see also SCR No. 101, 11/13/01 Tender Years Opinion).

Petitioner's eight-day trial commenced on November 7, 2001.  The Honorable Fred P. Anthony, who had presided over much of the pretrial proceedings, presided over the trial as well. The court appoint Paul J. Susko, Esq., to act as standby counsel for Petitioner.  Assistant District Attorneys Damon C. Hopkins, Esq., and Patricia Kennedy, Esq., prosecuted the case.  The jury was selected two days beforehand from a venire in Washington County, Pennsylvania.

Each of the witnesses discussed above testified.  In addition, the Commonwealth introduced physical and scientific evidence establishing Petitioner's guilt.  One of its experts demonstrated that the mitochondrial DNA of the hair found on M.R.'s underwear matched Petitioner's mitochondrial DNA exactly.  The expert explained that the maximum frequency that this particular mitochondrial DNA sequence would occur in the population would be 0.07%, and

therefore in a sample size of around 3,000-4,000 people, she would expect that it would exclude 99.93% of the sample.  (Day Six Trial Tr. at 43-48).  Investigators had recovered a second hair from the ligature found at the scene where M.R.'s abductor had abandoned her, and it was sent for nuclear DNA testing.  (Day Five Trial Tr. at 128-29).  An expert testified that five of the sixteen available DNA loci obtained from that hair matched Petitioner, including the sex marker. None of the loci excluded him as the source of the hair.  The expert said that the probability of finding another African American person at random with the same DNA markers is 1 in 5,300. (Day Six Trial Tr. at 101-08).

The Commonwealth's physical and scientific evidence also showed that M.R. had been in Petitioner's Buick LeSabre.  During a search of that car, the police removed red fibers from the carpet covering the transmission "hump" between the two front seats.  (Day Four Trial Tr. at 22-24, 31-35).  Fiber comparisons were done between those fibers and fibers taken from the red pants M.R. had been wearing at the time of her abduction.  An expert testified that the fibers found in Petitioner's car matched the fibers of M.R.'s pants. The fibers were the same color, had the same thickness, same textures, and the same optical characteristics in white light, plain polarized light, and cross polarized light.  (Day Five Trial Tr. at 81-82, 124-27).

The Commonwealth also linked Petitioner to the crimes through the boot prints.  As discussed above, investigators did a comparison between Petitioner's boots and the prints left outside M.R.'s home and at the scene where she had been abandoned.  (Day Three Trial Tr. at 33-37, 47-48, 154, 192-204).  An expert testified that Petitioner's boot made the print found outside M.R.'s home.  The expert explained that his boot was the same size, had the same tread design, same pattern of worn tread, and same post-manufacturing gouge as the boot print left outside M.R.'s home.  (Id. at 200, 202-03).  The expert further explained that Petitioner's boot also exhibited the same size, tread design and wear of the lower-quality boot print recovered at the scene where M.R. had been abandoned  (Id. at 192-204).

Additionally, the Commonwealth introduced evidence of incriminating statements Petitioner made in a letter he wrote to an inmate incarcerated with him at the Erie County Jail.

7

(Day Five Trial Tr. at 300-10).  In discussing his case with the inmate, Petitioner wrote: "my car had been cleaned out of all the little girl's hair, blood, all that.  I bought new floor mats, steering wheel cover, all that shit.  I think my sister told on me....They found one little hair on the little girl.  Now I [sic] waiting on DNA[.]"  He also wrote that the victim was a "little Puerto Rican," which was information that had not been released to the public.  (Id. at 309).  The inmate testified that Petitioner indicated that he regretted what he had done and that he had been up for three days drinking brandy prior to committing the crimes.  The inmate also testified that Petitioner was very worried that the DNA testing would prove his guilt.  (Id. at 310).

Okey Lawrence testified about the night he confronted Petitioner after he saw him peeping in the window of a home with children located in M.R.'s neighborhood.  (Id. at 256-75). Two other witness testified that they saw Petitioner in the neighborhood prior to M.R.'s kidnapping.  (Id. at 213, 244; Day Eight Trial Tr. at 48-61).

Petitioner testified in his own defense and insisted that the police framed him and planted all of the physical evidence linking him to the crimes.  He claimed that the letter the Commonwealth introduced from him to the inmate was a forgery.  Petitioner also provided a detailed explanation as to his whereabouts the night of February 15, 2001.  He said that he was at his sister Dierdra Lyons's house until about 5:45 p.m., and from there went to the laundromat. Around 7:30 p.m., he went to an auto shop to get break fluid for his car, then went back to his sister's house, and then returned to the laundromat.  After that, he returned to his sister's house once again, and stayed there until about 8:30 p.m.  (Day Six Trial Tr. at 203-54).  That Petitioner left his sister's between 8:00-8:30 p.m. was corroborated by Dierdra Lyons, who testified as an alibi witness.  (Day Seven Trial Tr. at 212).  Dierdra Lyons's testimony did not provide Petitioner with a complete alibi, however, because under the timeframe proposed by the prosecution, M.R. could have been abducted after 8:30 p.m.  Morever, Dierdra Lyons said that it would take only about five minutes to drive from her house to M.R.'s house.  (Id. at 214).

To account for his whereabouts for the rest of the evening, Petitioner testified that after he left his sister's house, he went to Eric Lomox's house.  No one was home, so he went to a bar

8

operated by his uncle, George Lyons.  He left because his uncle was not there.  Petitioner then went to another bar operated by his uncle called the Lyons Den.  He met a woman there, and they left together between 10:45-11:00 p.m.  Petitioner said that he and the woman went to Steppin' Out Lounge, and he left from there to go to work at around 11:15 p.m.  When he was driving to work, he noticed that the woman left her keys in his car, so he had to turn around and take them to her at the Rook (a bar located next to Steppin' Out Lounge).  Petitioner said that is what caused him to be late for work.  (Day Six Trial Tr. at 203-54).

The jury did not credit Petitioner's defense.  On November 15, 2001, it found him guilty of: Count 1– attempted homicide; Count 2– rape; Count 3– involuntary deviate sexual intercourse ("IDSI") (by anus or by mouth); Count 4– aggravated indecent assault; Count 5– indecent assault; Count 6– aggravated assault (merged with Count 1); Count 7– kidnapping; Count 8– interference with custody of a child; Count 9– possessing instruments of a crime;[2] Count 10– making terroristic threats; Count 11– burglary; Count 12– statutory sexual assault (merged with Count 2); Count 13– corruption of a minor; Count 14– unlawful restraint (merged with Count 7); and, Count 15– recklessly endangering another person (merged with Count 6).

At Petitioner's request, counsel was appointed to represent him at sentencing.  On January 30, 2002, the trial court sentenced him to an aggregate term of incarceration of seventy-nine years and two months to 158 years and four months.  Sentencing counsel withdrew his representation and new counsel was appointed.  On June 13, 2002, the trial court denied Petitioner's post-trial motions.  (SCR No. 129a).  On July 7, 2002, post-sentence counsel was permitted to withdraw and Petitioner chose to represent himself on direct appeal.

In his appeal, Petitioner contended, in relevant part, that the application of the Tender Years Statute to his case violated his constitutional right to confront his accuser (M.R.) and his right to compulsory process to call a witness in his favor (M.R.).  [See *Petition*, Document No. 7, ¶ 9f, listing grounds raised on direct appeal].  On September 22, 2003, the Superior Court of

---

[2]  The prosecution argued during its summation that the ligature was an instrument of crime, but when the trial court charged the jury it only referred to the knife that M.R. said her abductor held to her throat.  (Day Eight Trial Tr. at 140, 185-86).

Pennsylvania issued a decision in which it affirmed Petitioner's judgment of sentence. Commonwealth v. Lyons, 833 A.2d 245 (Pa.Super. 2003) ("Lyons 1").  It denied on the merits his confrontation and compulsory process claims.  Id. at 252-55.

Petitioner initially did not file a petition for allowance of appeal ("PAA").  On March 8, 2004, the United States Supreme Court issued Crawford v. Washington, 541 U.S. 36 (2004), a decision that changed the legal landscape for determining whether the admission of testimonial out-of-court statements violate a defendant's rights under the Confrontation Clause.  Not long thereafter, the Pennsylvania Supreme Court granted Petitioner leave to file a PAA *nunc pro tunc*. On July 12, 2005, it issued an Order denying the PAA and a supplement thereto.  (SCR No. 148). Petitioner did not file a petition for writ of certiorari in the United States Supreme Court.[3]

On or around February 2, 2006, Petitioner filed a *pro se* petition under Pennsylvania's Post Conviction Relief Act (PCRA), 42 PA.CONS.STAT.ANN. § 9541 *et seq.*, in which he once again claimed that his confrontation and compulsory process rights were violated by the admission of M.R.'s out-of-court statements.  He also contended that the prosecution suppressed police and bank records pertaining to purported alibi witness Joan Edenfield (the woman he claims he met at the Lyons Den on February 15, 2001) in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963).  Petitioner further contended that his first court-appointed counsel, Richmond and Murphy, were ineffective for not investigating his alibi witnesses (Edenfield and George Lyons) and not filing a notice of alibi defense in the omnibus pretrial motion that they filed before he dismissed them.  (SCR No. 149).

The PCRA Court (the Honorable Shad Connelly), appointed William J. Hathaway, Esq., to represent Petitioner.  On March 23, 2006, Hathaway filed a petition to withdraw and a no-merit letter.  (SCR No. 152)  On March 29, 2006, the PCRA Court issued an *Opinion and Notice of Intent to Dismiss PCRA Without Hearing Pursuant to Pa.R.Crim.P. 907(1)*, and a few days

---

[3]  This Court previously held that, for the purposes of determining that the petition for writ of habeas corpus was timely filed under the statute of limitations set forth at 28 U.S.C. § 2244(d), Petitioner's judgment of sentence became final in October 2005, when the ninety-day period to file a petition for writ of certiorari in the United States Supreme Court expired.  [Document Nos. 31, 34].

after that it granted Hathaway's petition to withdraw.  (SCR No. 153).  On May 23, 2006, after receipt of Petitioner's objections, the PCRA court issued an order denying PCRA relief.  (SCR No. 158).

Petitioner appealed.  On February 12, 2007, the Superior Court issued a decision affirming the denial of PCRA relief.  (SCR No. 161, Commonwealth v. Lyons, No. 1101 WDA 2006, slip op. (Pa.Super. Feb. 12, 2007) ("Lyons 2")).  It held that the Brady and ineffective assistance claims had no merit.  It also held that the Brady claim was waived because Petitioner could have raised it on direct appeal but failed to do so.  42 PA.CONS.STAT.ANN. § 9544(b).  The Superior Court denied Petitioner's claims challenging the admission of M.R.'s out-of-court statements because those claims had been "previously litigated" on direct appeal.  See 42 PA.CONS.STAT.ANN. § 9544(a)(2).[4]  Petitioner's application for reconsideration was denied on April 18, 2007.

Next, Petitioner filed the instant habeas corpus petition.  [Document No. 7].  He raises the same four claims discussed above.  Respondents filed their Answer [Document No. 33], to which Petitioner filed a Reply [Document No. 40].

## B.    Discussion

### 1.    Standard of Review

This Court's review of each of Petitioner's habeas claims is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132 § 104,

---

[4]  Under the PCRA, a petitioner is not eligible for relief on an issue that has been "previously litigated."  See 42 PA.CONS.STAT.ANN. §§ 9543, 9544.  An issue is "previously litigated" if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue."  Id. § 9544(a)(2).  "Furthermore, 'an issue may not be relitigated merely because a new or different theory is posited as a basis for reexamining an issue that has already been decided.'"  Boyd v. Waymart, 579 F.3d 330, 367 (3d Cir. 2009) (Hardiman, J., in Part III) (quoting Commonwealth v. Senk, 437 A.2d 1218, 1220 (Pa. 1981)).  "The 'previously litigated' rule codified in § 9544(a) simply relieves Pennsylvania courts of the burden of revisiting issues which are res judicata....[it] insulates state courts from duplicative effort but does not preclude federal habeas review [under the procedural default doctrine]."  Id. at 369-370.  "When a PCRA court invokes the 'previously litigated' rule, it does so not because an applicant has failed to present his claims, but because he has already presented those claims at least once before and received a decision on the merits."  Id. at 370.  See also Cone v. Bell, – U.S. – , 129 S.Ct. 1769, 1781 (2009) ("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review.").

110 Stat. 1214.  AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).  It "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations."  Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).

As codified at 28 U.S.C. § 2254(d)(1), AEDPA restricts a federal court's authority to grant relief when, as is the case here, the state court has "adjudicated on the merits" the petitioner's federal constitutional claims.  "'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other ground."  Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009) (quoting with approval Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)).  Under § 2254(d)(1), federal habeas relief may only be granted when the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  See also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert, 387 F.3d at 234.

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'"  Lambert, 387 F.3d at 234 (quoting Williams, 529 U.S. at 405-06).  "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular…case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'"  Id. (quoting Williams, 529 U.S. at 407).  Federal courts "are not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because

we would have reached a different result if left to our own devices."  Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).  It is not enough for Petitioner to show that the state court's adjudication of any of his claims was an "incorrect or erroneous" application of United States Supreme Court precedent.  Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Instead, he must show that the state court's adjudication "cannot reasonably be justified under existing Supreme Court precedent."  Hackett v. Price, 381 F.3d 281, 287 (3d Cir.2004) (citations omitted); Waddington v. Sarausad, — U.S. — , 129 S.Ct. 823, 831 (2009) (where it is the state court's application of governing federal law that is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted); see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold").

## 2.   Confrontation Clause Claim

In his first claim, Petitioner challenges the admission of the out-of-court statements M.R. made to D.G., Officer Kuhn, Detective Emerick, Agent Valentine, and Dr. Smith.  He argues that the introduction of those statements via the Tender Years Statute violated his constitutional right to confront the witness against him.

### (a)

The Sixth Amendment's Confrontation Clause provides: "in all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him."  U.S. Const., Amend. VI.  The Supreme Court observed in Ohio v. Roberts, 448 U.S. 56, 63 (1980) that: "If one were to read this language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial.  But, if thus applied, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." In an effort to accommodate the competing interest of the Confrontation Clause's preference for face-to-face confrontation at trial against a jurisdiction's strong interest in effective law enforcement and the development and precise formulation of the rule of evidence applicable in

criminal proceedings, the <u>Roberts</u> Court set forth a general approach to determining whether the admission of a statement made by an unavailable declarant violates the Confrontation Clause.  <u>Id.</u> at 64-65.  It held that when a declarant is unavailable at trial, the Confrontation Clause requires that his or her statement is admissible only if it bears adequate "indicia of reliability."  <u>Id.</u> at 66. Under <u>Roberts</u>, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception."  <u>Id.</u>  When the evidence does not fall within a firmly rooted hearsay exception, a showing of "particularized guarantees of trustworthiness" must be made.  <u>Id.</u>

When the Superior Court adjudicated Petitioner's Confrontation Clause claim in <u>Lyons 1</u>, <u>Roberts</u> was the "clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1).  Applying the rule articulated in <u>Roberts</u>, the Superior Court held that the admission of M.R.'s out-of-court statements did not run afoul of the Confrontation Clause because the trial court had made the pretrial determination that M.R. was not available to testify and that her statements provided sufficient indicia of reliability.  <u>Lyons 1</u>, 833 A.2d at 252-53.

About five months after the Superior Court decided <u>Lyons 1</u>, the United States Supreme Court decided <u>Crawford v. Washington</u>, 541 U.S. 36 (2004) and "changed the legal landscape for determining whether the admission of *testimonial* hearsay statements violated the accused's rights under the Confrontation Clause.*"  <u>Albrecht v. Horn</u>, 485 F.3d 103, 134 (3d Cir. 2007) (emphasis added).  After reviewing the Clause's historical underpinnings, the Supreme Court held that it guarantees a defendant's right to confront those "who bear testimony" against him.  <u>Crawford</u>, 541 U.S. at 51.  It concluded that <u>Roberts</u> potentially excluded too much testimony because it imposed Confrontation Clause restrictions on nontestimonial hearsay not governed by that Clause.  <u>Id.</u> at 60.  <u>See</u> <u>also</u> <u>Whorton v. Bockting</u>, 549 U.S. 406, 413-14, 420 (2007).  At the same time, the <u>Crawford</u> Court noted, the <u>Roberts</u> test was too "malleable" in permitting the admission of *ex parte* testimonial statements.  <u>Id.</u>  It concluded:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence,

much less to amorphous notions of 'reliability.' ... Admitting statements deemed reliable by a judge is fundamentally at odds with the right to confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

Id. at 61.

The Crawford Court held that the Confrontation Clause prohibits out-of-court *testimonial* statements by a witness, regardless of whether the statements are deemed reliable by the trial court, unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. Id. at 51-54. See Melendez-Diaz v. Massachusetts, – U.S. –, 129 S.Ct. 2527, 2531-32 (2009); United States v. Jimenez, 513 F.3d 62, 76-77 (3d Cir. 2008). "On the other hand, nontestimonial statements do not violate the Confrontation Clause and are admissible as long as 'they are subject to a firmly rooted hearsay exception or bear an adequate indicia of reliability.'" Jimenez, 513 F.3d at 77 (quoting Albrecht, 485 F.3d at 134 (Roberts continues to control nontestimonial statements after Crawford)).

In the meantime, Petitioner was pursuing his PAA with the Supreme Court of Pennsylvania. The PAA and Petitioner's supplement thereto have not been submitted with the SCR. According to Petitioner, he sought a review of his Confrontation Clause under Crawford. Because Petitioner's direct appeal was still pending and he appears to have preserved his Confrontation Clause claim at all stages of review, state-law rules governing the retroactive application of new rules of criminal procedure did not bar the Pennsylvania Supreme Court from reviewing Petitioner's claim under Crawford. See Commonwealth v. Baumhammers, 960 A.2d 59, 95 (Pa. 2008). However, Pennsylvania Supreme Court action on a PAA is not a matter of right; it is purely discretional. Similar to decisions as to review on certiorari by the United States Supreme Court, a PAA is to be granted "only when there are special and important reasons therefor." Pa.R.App.P. 1114. See also 20 Pennsylvania Appellate Practice § 1114:1 (West 2008-09 ed.). The Pennsylvania Supreme Court determined that Petitioner's PAA did not present a claim that warranted review by it. On July 12, 2005, it issued an Order denying the PAA (as

supplemented by Petitioner) without comment.  (SCR No. 148).  Under Pennsylvania law, that Order does **not** constitute a ruling on the merits.  Commonwealth v. Ogrod, 839 A.2d 294, 317 (Pa. 2003) (citations omitted); see also 20 Pennsylvania Appellate Practice § 1114:5.

### (b)

Petitioner contends that Crawford applies to his case and that under the rule announced therein the admission of M.R.'s out-of-court statements was an error of constitutional proportions.  His argument poses the threshold questions of whether this Court may consider Crawford in light of the restrictions imposed on federal habeas review by: (1) the retroactivity rule pertaining to federal courts in habeas announced in Teague v. Lane, 489 U.S. 288 (1989); and (2) AEDPA's standard of review codified at 28 U.S.C. § 2254(d)(1).

Under Teague, a state prisoner seeking habeas relief in federal court may not rely on a "new" constitutional rule of criminal procedure that was announced after the date his conviction became final.  489 U.S. at 310. In Whorton v. Bockting, 549 U.S. 406 (2007), the Supreme Court held that Crawford announced a "new" rule and therefore it does not apply to federal habeas cases in which the petitioner's state conviction became final before March 8, 2004 (the date Crawford was decided).  The United States Supreme Court has instructed that "[a] state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." Caspari v. Bohlen, 510 U.S. 383, 390 (1994) (citing Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1987)).  Pursuant to that instruction, Petitioner's conviction became final in October 2005, when the ninety-day period expired for him to file a writ of certiorari from the July 12, 2005, Order denying his PAA. Id.; cf. Jimenez v. Quarterman, — U.S. — , 129 S.Ct. 681 (2009) (where a state court grants a criminal defendant the right to file an out-of-time direct appeal, his conviction is not "final" under AEDPA's statute of limitations, 28 U.S.C. § 2244(d)(1)(A), until the conclusion of the out-of-time direct appeal, or the expiration of the time for seeking certiorari review of that appeal).  Because Petitioner's conviction became final after Crawford was issued, this Court is

**not** barred under <u>Teague</u> from applying it to Petitioner's case.

The next question is whether this Court may look to <u>Crawford</u> under AEDPA's standard of review, as the Superior Court denied the claim on the merits in <u>Lyons 1</u>, five months before <u>Crawford</u> was decided, but Petitioner's convictions became final post-<u>Crawford</u>, in October 2005. AEDPA, as codified at 2254(d)(1), establishes a strict choice-of-law rule that some courts have determined is not entirely analogous to <u>Teague</u>'s rule.  See, e.g., <u>Newland v. Hall</u>, 527 F.3d 1162, 1200 n.64 (11th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1336 (2009).  As set forth above, AEDPA provides that when a state court has adjudicated the merits of a petitioner's federal constitutional claim, federal habeas relief may not be granted unless the petitioner shows that the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).  The statutory phrase "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta," of the United States Supreme Court's "decisions *as of the time of the relevant state-court decision*."  <u>Carey v. Musladin</u>, 549 U.S. 70, 74 (2006) (quoting <u>Williams</u>, 529 U.S. at 412) (O'Connor, J., for the Court) (emphasis added).[5]

---

[5] Courts of appeals have recognized that the Supreme Court has provided inconsistent guidance on the precise time to which a federal court should look when assessing § 2254(d)(1)'s phrase "clearly established Federal law, as determined by the Supreme Court of the United States[.]"  <u>See Newland</u>, 527 F.3d at 1198, n.62; <u>Brown v. Greiner</u>, 409 F.3d 523, n.3 (2ⁿᵈ Cir. 2005).  Justice O'Connor was writing for the Court in <u>Williams</u> when she stated that the phrase refers "to the holdings, as opposed to the dicta, of this Court's decisions *as of the time of the relevant state-court decision*."  529 U.S. at 412 (emphasis added).  Justice Stevens, though, was writing for the Court when he stated:  "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established *at the time his state-court conviction became final*."  <u>Id.</u> at 390.  Justice O'Connor's "relevant state court" definition has been recited by the Supreme Court in several other decisions, <u>see, e.g.</u>, <u>Musladin</u>, 549 U.S. at 74; <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 660-61 (2004); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003); <u>Tyler v. Cain</u>, 533 U.S. 656, 664 (2001), and it is the definition the Third Circuit Court recites, <u>see, e.g.</u>, <u>McMullen v. Tennis</u>, 562 F.3d 231, 236 (3d Cir. 2009); <u>Fahy v. Horn</u>, 516 F.3d 169, 194 (3d Cir. 2008).  Therefore, that is the definition used in the instant case.

In the recent decision, <u>Smith v. Spisak</u>, — U.S. — , 130 S.Ct. 676, 681 (2010), Justice Breyer, in delivering the Opinion of the Court, recognized "some uncertainty" as to what definition applied.  In <u>Spisak</u>, the petitioner claimed that the instructions and verdict forms given at his capital sentencing hearing violated the new rule of constitutional criminal procedure announced in <u>Mills v. Maryland</u>, 486 U.S. 367 (1988).  <u>Mills</u> was decided on June 6, 1988 – *after* the Ohio Supreme Court had issued its decision denying his direct appeal, but *before* the United States Supreme Court denied certiorari.  <u>State v. Spisak</u>, 36 Ohio St.3d 80, 521 N.E.2d 800 (decided April 13, 1988), <u>cert. denied</u>, 489 U.S. 1071 (decided Mar. 6, 1989).  The <u>Spisak</u> Court assumed without deciding that <u>Mills</u> set forth the pertinent "clearly established Federal law," because the parities and the Sixth Circuit Court had made that assumption.

(continued...)

The "relevant state-court decision" in this case is <u>Lyons 1</u>, decided September 22, 2003. That is the "decision finally resolving" the Confrontation Clause claim "with res judicata effect." <u>Thomas</u>, 570 F.3d at 114.  <u>See also Newland</u>, 527 F.3d at 1198-1201; <u>cf. Bond v. Beard</u>, 539 F.3d 256, 289-90 (3d Cir. 2008) (Applying AEDPA deference to PCRA court decision "since it either represents the state courts' last reasoned opinion on this topic or has not been supplemented in a meaningful way by the higher state court.").[6]  The Superior Court's adjudication in <u>Lyons 1</u> of Petitioner's Confrontation Clause claim was neither "contrary to" nor an "unreasonable application of" <u>Roberts</u>, which was the "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) at the time. Accordingly, Petitioner is not entitled to habeas relief on his Confrontation Clause claim.

**(c)**

In the alternative, even if <u>Teague</u> and AEDPA are congruent in relevant part and <u>Crawford</u> sets forth the pertinent "clearly established Federal law" for the purposes of reviewing Petitioner's Confrontation Clause claim, <u>see</u> note 5, this Court still would recommend that he be denied habeas relief.  Indeed, Petitioner would not be entitled to relief even under pre-AEDPA *de novo* review.

<u>Crawford</u>'s rule applies only to out-of-court statements that were "testimonial."  The <u>Crawford</u> Court expressly declined to explain the distinction between testimonial and nontestimonial statements, stating "[w]e leave for another day any effort to spell out a

_____

[5](...continued)
130 S.Ct. at 681. In contrast, in this case Respondents contend that this Court may not look to <u>Crawford</u> in evaluating Petitioner's Confrontation Clause claim; therefore, this Court will not assume that <u>Crawford</u> applies.

[6]  The Pennsylvania Supreme Court's July 12, 2005, Order denying the PAA is not a "decision"; it simply is an order denying discretionary review.  <u>See Newland</u>, 527 F.3d at 1200 & n.64.  In <u>Newland</u>, the Eleventh Circuit Court recognized that AEDPA restricts the scope of federal habeas review "even further than <u>Teague</u>," in the circumstance presented by the instant case (that is, when an intermediate appellate court decides a claim on direct appeal, then the United States Supreme Court issues a new rule under <u>Teague</u>, and then the state supreme court exercises its discretion to deny certiorari review and direct appeal becomes final).  527 F.3d at 1199-1200.  In the circumstance presented here, the Eleventh Circuit Court recognized that "while we could apply this new rule retroactively on collateral attack under <u>Teague</u>, we would not be able to do so under our interpretation of AEDPA, because our review is limited to Supreme Court decisions at the time of the relevant state court decision, *i.e.*, the intermediate appellate court's decision."  <u>Id.</u> at 1200 n.64.

comprehensive definition of 'testimonial.'  Whatever else the term covers, it applies at a

minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and

to police interrogations."  541 U.S. at 67 (footnote omitted).  Two years later, the Supreme Court

decided Davis v. Washington, 547 U.S. 813 (2006).  At issue in the consolidated appeal in Davis

were two separate statements.  The first was a statement made by a victim of spousal abuse to a

911 operator;[7] the second was a wife's statement to police officers dispatched to investigate a

domestic disturbance, set forth in a battery complaint.  In finding the statement to the 911

operator nontestimonial, but the wife's statement to the police officers testimonial, the Davis

Court set forth the following inquiries for determining whether statements are testimonial or

nontestimonial:

> Statements are nontestimonial when made in the course of police interrogation under
> circumstances objectively indicating that the primary purpose of the interrogation is to
> enable police assistance to meet an ongoing emergency.  They are testimonial when the
> circumstances objectively indicate that there is no such ongoing emergency, and that the
> primary purpose of the interrogation is to establish or prove past events potentially
> relevant to later criminal prosecution.

Id. at 822.

The Davis Court acknowledged that the two inquiries described above were not

exhaustive and did not address all possible scenarios – such as situations which do not involve

interrogations – in which a determination of whether a statement is testimonial or nontestimonial

is required, explaining:

> Our holding refers to interrogations because ... the statements in the cases presently
> before us are the products of interrogations–which in some circumstances tend to
> generate testimonial responses.  This is not to imply, however, that statements made in
> the absence of any interrogation are necessarily nontestimonial.  The Framers were no
> more willing to exempt from cross-examination volunteered testimony or answers to
> open-ended questions than they were to exempt answers to detailed interrogation.

Id. at 822 n. 1.

---

[7]  In determining that the recording of the 911 call was not testimonial evidence, the Davis Court noted: "If
911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they
conduct interrogations of 911 callers.  For purposes of this opinion (and without deciding the point), we consider their
acts to be acts of the police.  As in Crawford ..., therefore, our holding today makes it unnecessary to consider whether
and when statements made to someone other than law enforcement personnel are 'testimonial.'"  547 U.S. at 823 n.2.

Petitioner argues that M.R.'s statements to Officer Kuhn, Lt. Emerick, and FBI Agent Valentine fall squarely within the class of  "testimonial" hearsay because M.R. made those statements to them when they were questioning her as part of the police investigation relevant to criminal prosecution, and not during an ongoing emergency.  Crawford, 541 U.S. at 53-43; Davis, 547 U.S. at 822-34.  He argues that M.R.'s statements to Dr. Smith likewise were testimonial because the police purportedly had asked the doctor to try and obtain information from M.R. that would assist them in their prosecution.  See Commonwealth v. Allshouse, No. 55 WAP 2008, – A.2d — , 2009 WL 5103602, *6 (Pa. Dec. 29, 2009) (declining to address whether statements given by a four-year-old sexual assault victim to her psychologist qualified as testimonial under Crawford because any error in admitting the statement was harmless).[8]

Even if this Court accepts Petitioner's arguments and holds that some or all of the statements given to those four witnesses were testimonial, that still leaves several of the statements M.R. made to her mother, D.G., including when she said that Petitioner raped her, that he held a knife to her throat, and when she identified him as her abductor after she saw him on the television at HealthSouth.  Those statements were nontestimonial[9] and therefore their admission did not violate the Confrontation Clause under the rule announced in Crawford.

Petitioner seems to recognize that these statements made by M.R. to D.G. are nontestimonial and not affected by Crawford's rule.  He attempts to challenge those statements by arguing that the trial court admitted them in violation of state rules of evidence.  [See *Reply*,

---

[8]  Contrary to Petitioner's assertion, Dr. Smith testified at trial that in her role as a therapist, she is "acting not as an investigator investigating a crime."  (Day Six Trial Tr. at 66).

[9]  On cross-examination, Petitioner elicited testimony from D.G. to support a finding that M.R. stated that her abductor held a knife to her throat.  It is not entirely clear from the trial transcript if M.R. made those statements to D.G. in a private conversation, during a police interview, a therapy session with Dr. Smith, or at some other time. (Day Two Trial Tr. at 48-49).  Given the ambiguity in the transcript and that it is Petitioner's burden on collateral attack to show entitlement to relief, an ambiguous record simply does not carry Petitioner's burden.  Higgason v. Clark, 984 F.2d 203, 208 (7th Cir.1993) ("On collateral attack, a silent record supports the judgment; the state receives the benefit of a presumption of regularity and all reasonable inferences.... [The petitioner's] entire position depends on persuading us that all gaps and ambiguities in the record count against the state.  Judgments are presumed valid, however, and ... [the] one who seeks collateral relief bears a heavy burden.").  Petitioner has not met his burden of showing that M.R.'s statement to D.G. about the knife was testimonial.  Moreover, since he is the one that questioned D.G. about the statement regarding the knife, he cannot complain about its admission.

Document No. 40 at 45-47].  A state court's ruling on a state-law issue is unreviewable by this Court.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (federal courts may not "reexamine state court determination on state-law questions"); Wells v. Pestock, 941 F.2d 253, 256 (3d Cir. 1991) ("Our review of a federal habeas corpus petition is limited to remedying deprivations of a petitioner's federal constitutional rights.  We take no cognizance of non-constitutional harm to the defendant flowing from a state's violation of its own procedural rule, even if that rule is intended as a guide to implement a federal constitutional guarantee.").

Finally, any erroneous admission of testimonial evidence in violation of the Confrontation Clause was harmless with respect to all of Petitioner's convictions, except perhaps his conviction of making terroristic threats (Count 10).  Jimenez, 513 F.3d at 78 (harmless error analysis applies to a Confrontation Clause challenge).  As far as this Court can tell, that is the only conviction that may have been established solely by M.R.'s alleged testimonial statements.

The harmless error evaluation applicable in habeas is that which is set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), which requires that in order to grant habeas relief a federal habeas court must find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict."  Id. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  See also Fry v. Pliler, 551 U.S. 112 (2007).  "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless."  O'Neal v. McAninch, 513 U.S. 432, 436 (1995) (quotation marks omitted).

It is true that through the introduction of the alleged testimonial statements, the jury heard M.R.'s own description of what her abductor did to her, and the prosecution was able to link Petitioner to the crimes through her identification of his car, some items that were in it, and articles of his clothing.  However, information about what Petitioner did to M.R. was surmisable from the physical injuries that she sustained[10] and through the wealth of independent

---

[10]  For example, with regard to the rape conviction, the pediatric urologist who treated M.R. testified that the injuries she sustained to her vaginal area were consistent with penile insertion.  (Day Five Trial Tr. at 138-49).  Also,

(continued...)

circumstantial evidence.  Moreover, the most significant identification evidence was admitted through other independent sources.  Those sources included M.R.'s nontestimonial identification of Petitioner as her abductor when she saw him on the television in the recreation room at HealthSouth; expert evidence showing that the DNA recovered from the hair found on M.R.'s underwear and on the ligature matched Petitioner's DNA; expert evidence showing that the red fibers recovered from his car exactly matched the fibers from the pants worn by M.R.; expert evidence showing that his boots matched the boot prints left at the crime scenes; and, the incriminating statements Petitioner made in a letter to a fellow inmate in the Erie County Prison. This Court is not in grave doubt that the admission of the purported testimonial statements had a "substantial and injurious effect or influence" on the jury's verdicts, save for its verdict on Count 10– making terroristic threats.

**(d)**

It is recommended that a certificate of appealability be granted with respect to Petitioner's Confrontation Claim as it pertains to his conviction of making terroristic threats.[11]  It is so recommended because reasonable jurists could disagree with this Court's conclusion that <u>Crawford</u> does not apply and because the admission of alleged testimonial out-of-court statements may not have been harmless with respect to that conviction.

**3.      Compulsory Process Claim**

In his next claim, Petitioner contends that the application of the Tender Years Statute to

---

[10](...continued)

M.R. told D.G. that she was raped.  Additionally, the testimony of the urologist and of the nurses that treated M.R., along with the photographic evidence of her injuries, supported the finding that Petitioner performed anal sex with M.R (IDSI), and that he assaulted her in all the ways charged.  (Although M.R.'s out-of-court statements likely were the only evidence offered to support a finding that Petitioner forced her to perform oral sex on him, the jury was charged that it could find Petitioner guilty of IDSI for either anal or oral sex.  (Day Eight Trial Tr. at 168-71, 205-06)).

[11]  28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]"  <u>Szuchon v. Lehman,</u> 273 F.3d 299, 312 (3d Cir. 2001) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).

his case violated his right to compulsory process "as it interfered with [his] right to be identified by his accuser and hindered his ability to subpoena his accuser[.]"  [*Petition*, Document No. 7 at 11].  The right to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.  <u>Rock v. Arkansas</u>, 483 U.S. 44, 51 (1987).  <u>See also</u> <u>Government of Virgin Islands v. Mills</u>, 956 F.2d 443, 445 (3d Cir. 1992) ("the fundamental right of an accused to present witnesses in his own defense is an essential attribute of our adversary system of justice") (citing <u>Taylor v. Illinois</u>, 484 U.S. 400, 408 (1988); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973)).[12]

In <u>Washington v. Texas</u>, 388 U.S. 14 (1967), the Supreme Court considered whether a defendant's right to have compulsory process for obtaining witnesses in his favor was violated by a state evidentiary rule providing that persons charged as principals, accomplices, or accessories in the same crime cannot be introduced as witnesses for each other.  388 U.S. at 15-16.  Applying that rule, the trial court did not allow the defendant to call an eyewitness to a shooting because he was allegedly an accomplice.  <u>Id.</u>  In concluding that this witness was unconstitutionally excluded, the Supreme Court directed its attention to the nature of the evidentiary rule the state court used to exclude the witness:

> It is difficult to see how the Constitution is any less violated by arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief.
>
> The rule disqualifying an alleged accomplice from testifying on behalf of the defendant cannot even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury.  The absurdity of the rule is amply demonstrated by the exceptions that have been made to it.

<u>Id.</u> at 22.  The Supreme Court continued:

---

[12] "The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony[.]"  <u>Rock</u>, 483 U.S. at 51.  The Compulsory Process Clause "protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling from the trial judge."  <u>Mills</u>, 956 F.2d at 445.  The Third Circuit Court has held that "[t]here is apparently little, if any, difference in the analysis" of whether a trial court's ruling denied a petitioner his federal constitutional right to compulsory process or due process of law.  <u>Id.</u> at 445 n.4.

> We hold that the petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.

Id. at 23.  The Supreme Court noted, however, that it was not "deal[ing] in this case with nonarbitrary state rules that disqualify as witnesses person who, because of mental infirmity of infancy, are incapable of observing events or testifying about them."  Id. at 23 n.21.

Citing Washington and subsequent Supreme Court decisions, the Third Circuit Court has held that a defendant's constitutional right to obtain witnesses in his favor "is not absolute.  The Sixth Amendment requires more than a mere showing by the accused that some relevant evidence was excluded from his trial.  Rather, the accused must show how that testimony would have been both *material* and *favorable* to his defense."  Mills, 956 F.2d at 446 (emphasis in original) (citing United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) (importing the materiality requirement from the line of cases beginning with Brady into compulsory process clause analysis)).  As a consequence, the Third Circuit Court held, to make out a claim under the Compulsory Process Clause, a petitioner must prove three factors.  First, he must show that he was deprived of the opportunity to present evidence in his favor.  Id.  Second, he must prove that the excluded testimony would have been material to his defense.  Id.  To satisfy this prong, the petitioner must show that there is a "reasonable likelihood" that the excluded testimony "could have affected the judgment of the trier of fact."  Id. (citing Valenzuela-Bernal, 458 U.S. at 874).  Third, a petitioner must prove that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose.  Id.

In adjudicating this compulsory process claim in Lyons 1, the Superior Court found it wanting under the third prong.  833 A.2d at 254-55.  After discussing the Supreme Court's decision in Washington, it concluded:

> Because the Tender Years statute requires a hearing and an individualized determination of competence prior to finding a witness unavailable, it is not an arbitrary rule disqualifying an otherwise mentally competent witness.  To the contrary, the mandatory Tender Years hearing ensures a competent and otherwise available witness will not be arbitrarily made unavailable.  Accordingly, we conclude the Tender Years Statute is constitutional under the 6th Amendment to

24

the U.S. Constitution…insofar as it relates to a defendant's right to call witnesses in his favor.

Lyons 1, 833 A.2d at 245.

The Superior Court's decision was neither "contrary to" nor "an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court[.]"  28 U.S.C. § 2254(d)(1).  For that reason, Petitioner's compulsory process claim is denied.  In addition, the claim is denied because, in light of the overwhelming evidence of Petitioner's guilt, it is not reasonably likely that the jury would have reached a different verdict on any count had M.R. testified.  Mills, 956 F.2d at 446.

### 4.     *Brady* **and Ineffective Assistance of Counsel Claims**

Petitioner's Brady and ineffective assistance of counsel claims concern two individuals that he maintains could have supported his alibi: (1) Joan Edenfield (the woman he claims he met at the Lyons Den the night of February 15, 2001); and (2) his uncle George Lyons.  The following background is relevant to both claims.

### (a)

Pennsylvania's criminal procedural rules require that a defendant provide a notice of alibi defense at the time he files his omnibus pretrial motion, and that in that notice he list the names and addresses of witnesses whom he intends to call in support.  Pa.R.Crim.P. 573 (2001) (now Pa.R.Crim.P. 567).  The purpose of this rule is it ensure "both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence." Commonwealth v. Anthony, 546 A.2d 1122, 1124 (Pa.Super. 1988) (citations omitted).  If a defendant fails to properly file a notice of alibi defense, the court may: (1) exclude the testimony offered for the purpose of proving the defense, except for testimony of the defendant; (2) grant a continuance to enable the Commonwealth to investigate the evidence; or (3) make other such order as the interests of justice require.  Pa.R.Crim.P. 573.

Petitioner's first omnibus pretrial motion was filed on June 28, 2001, and supplemented on July 20, 2001, when he was still represented by his court-appointed attorneys, Richmond and Murphy.  (SCR Nos. 17, 20).  No mention of an alibi defense was made.  After Petitioner was

granted permission to defend himself, the trial court permitted him to file an amended supplemental omnibus pretrial motion, which he filed in September 2001. (See SCR No. 47). In that motion, he did not provide any notice of alibi defense. (See also SCR No. 90, 11/9/01 Opinion).

On the second day of the trial, Petitioner submitted a belated notice of alibi defense and indicated that he intended to call as alibi witnesses Dierdra Lyons (his sister), George Lyons, and Joan Edenfield. The trial court initially did not allow Petitioner to call any of these witnesses for alibi purposes because the notice was untimely and the prosecution would be prejudiced.[13] (See Day Seven Trial Tr. at 24-25, 111-15; see also SCR No. 90, 11/9/01 Opinion). On the seventh day of trial, it was brought to the court's attention that Dierdra Lyons had told the police during an interview on February 24, 2001, that Petitioner had been at her house until around 8:00-8:30 p.m. on the evening that M.R. was kidnaped. The trial court concluded that Petitioner could call her as an alibi witness because the prosecution had sufficient notice that she could provide him with a partial alibi. (Id. at 118-21, 212).

In light of the trial court's ruling regarding Dierdra Lyons, the prosecutor informed the trial court that Joan Edenfield also had given a statement to police. (Id. at 199-201). The prosecutor explained that Edenfield called the police about a month earlier, after she received a subpoena from Petitioner. She told the police that she recalled being in Petitioner's company on a Thursday evening, but that she could not remember the exact date. The prosecutor explained to the court that a follow-up police investigation revealed that Edenfield had not been with Petitioner on February 15, 2001, and so he never personally interviewed her or investigated a potential alibi pertaining to her. There the matter stood until Petitioner served the Commonwealth with notice on the second day of trial that he wanted to call Edenfield as an alibi

---

[13] The trial court determined that a continuance would not be proper because "[t]rial has already commenced and testimony has been presented. To suspend the trial for a number of days to afford the Commonwealth an opportunity to investigate Defendant's alibi could affect the jurys' ability to recall testimony given at the beginning of this trial....Moreover, the jury is sequestered in a county far from their friends and relatives. Members of the jury would be required to sit idle for any number of days. Staying the proceedings for even two days could cause this trial to stretch into the Thanksgiving holiday – a prospect this Court is attempting to avoid." (SCR No. 90, 11/9/01 Opinion at 6).

witness.  The prosecutor argued that, unlike the case with Dierdra Lyons (where he knew that she could potentially provide partial alibi testimony), he had prepared for trial under the assumption that Edenfield could not offer any testimony helpful to Petitioner's case.[14]  The trial court ruled that Petitioner could not call Edenfield.  (Id.)

According to Petitioner, he obtained the police report and bank records pertaining to Edenfield four years after his trial.  He relied upon those records during the PCRA proceeding, and he has submitted them to this Court as Appendix 2 to his *Reply* [Document No. 40].  The police report shows that Edenfield called the police around September 27, 2001, and that they interviewed her in person on October 1, 2001.  Edenfield told the police that on the night she met Petitioner at the Lyons Den, her coworker James Shippling had given her a ride to the bar at around 5:30 p.m.  Edenfield initially told the police that she could not remember the exact date, but she later said she thought it might have been February 15, 2001, because she had asked Shippling and he told her it was the day after Valentine's Day.  Edenfield also gave the police additional information to determine the date she met Petitioner.  She said that she may have used her bank card that night at an ATM machine on Broad Street, and that she took a cab home. [Document No. 40, App. 2, police report at 251-53].

Edenfield told the police that she received letters from Petitioner on April 9 and September 25, 2001.  She said that Petitioner's mother, with whom she was acquainted, and Reverend Cooley, who was assisting in the defense investigation, had both called her in September 2001.  She told Cooley she had nothing to offer either side, and told the police that Cooley did not ask her any questions about the night and he "didn't press her further."  Edenfield told Petitioner's mother that she remembered meeting Petitioner at the Lyons Den.  [Id.]

After the police interviewed Edenfield, they obtained her bank records.  Those records

---

[14]  Petitioner has submitted to this Court a letter which he claims he sent the prosecutor on October 3, 2001, informing him that he might call Dierdra Lyons, George Lyons, and Edenfield as alibi witnesses.  [See *Reply*, Document No. 40, App. 3].  The trial transcript does not support a finding that he actually sent this letter.  When the issue of whether Petitioner had given the Commonwealth timely notice of alibi witnesses came up, the prosecutor stated that he never received any notice from Petitioner regarding alibi witnesses.  Petitioner *did not challenge the prosecutor's statement and never mention any October 3, 2001, letter*.  (Day Seven Trial Tr. at 24-25, 111-21, 199-201).

show that she did not use any ATM machine on February 15, 2001.  [Id. at 253; see also id. App. 2, bank records].  The police also called Erie Yellow Cab to see if there was any fare record showing that someone took a cab ride late on the night of February 15 or early in the morning on February 16, 2001, from the American Legion Post 700 (Edenfield's last stop before she took the cab ride home).  A cab company representative told the police that there was no record of such a fare on the dates in question.  (Id. at 253-54).  Additionally, the police interviewed James Edwards, who was the cab driver Edenfield said she called to pick her up at the American Legion.[15]  Edwards said that he knew Edenfield but that he could not specifically remember receiving a phone call from her.  (Id. at 254-55).

Finally, on October 2, 2001, the police interviewed Shippling.  Officer Gerald McShane's notes from the interview are as follows:

> Shippling told us that he has given Edenfield a ride from work to the Lyons Den once for sure and possibly two times.... Shippling is fairly certain that it was a Thursday[.]
>
> Shippling dropped Edenfield off at the Lyons Den between 1700 and 1730 and he believes she used the ATM next door to the bar.  Shippling had a conversation with Edenfield the following day at work.  She told him that she had gone to a couple of places that night but she was not more specific.  Shippling could not be more specific about the date this occurred other than it was during the winter months and it was sometime after Edenfield was involved in the accident.
>
> Shippling indicated that he recalls seeing the news reports of the abduction/rape but he does not recall ever having a conversation with Edenfield about the incident.
>
> I asked Shippling if he had any conversations with Edenfield concerning his giving her a ride to the Lyons Den from work.  He told us that the only time he talked with her about the ride was on 10-2-01 after I spoke with him on the phone and told him that we wanted to talk with him about it.  I asked him if he had been asked by Edenfield to pinpoint the exact date of this ride.  He told us that Edenfield had never asked him to help determine the date of that ride.  This question was asked because when I first spoke with Joan Edenfield on the phone on 9-27-01 she told me that the date of the ride was 2-15-01.  When I asked her how she was able to determine the date after such a long time she explained that she was uncertain herself so she asked Shippling about it and he told her it was the day after Valentine's Day.

( SCR No. 149, Ex. 1 at 254).

---

[15]  Edenfield said that on the night she called Edwards, he was too busy to pick her up so he sent another driver.

**(b)**

Petitioner contends that the Commonwealth violated his due process rights because it suppressed the police report pertaining to Edenfield and her bank records.  He claims that the information in the report is exculpatory because it shows that Edenfield could have been with him on Thursday evening around the date of M.R.'s kidnaping.  Petitioner argues that if the Commonwealth would have disclosed the report to him, he would have been prepared to challenge the prosecutor's contention that its investigation had revealed no evidence that Edenfield could support his alibi.

In Brady v. Maryland, 373 U.S. 83, 87 (1963) the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The purpose of Brady is not to require the prosecution to disclose all possibly favorable evidence to the defense but to make certain that the defendant will not be denied access to evidence which would ensure him a fair trial.  See United States v. Bagley, 473 U.S. 667, 675 (1985).  In order for Petitioner to prevail on his Brady claim, he must show: (1) the evidence at issue is favorable, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) that the suppressed evidence was material.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Banks v. Dretke, 540 U.S. 668, 691 (2004); Slutzker v. Johnson, 393 F.3d 373, 386 (3d Cir. 2004).  "[The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  Kyles v. Whitley, 514 U.S. 419, 434 (1995) (internal citations omitted).

The Superior Court denied Petitioner's Brady claim on the merits because he was aware

of his own whereabouts on the night in question, and therefore the Commonwealth did not suppress information unknown to him or that he could not have obtained himself with reasonable diligence.[16]  (SCR No. 161, <u>Lyons 2</u>, No. 1101 WDA 2006, slip op. at 8-9).  Its decision was neither "contrary to" nor "an unreasonable application of" <u>Brady</u>.  28 U.S.C. § 2254(d)(1).  Petitioner, his mother, and Reverend Cooley had contacted Edenfield at least four times.  Under these circumstances, the Commonwealth was not obligated to disclose the police notes from its interview with Edenfield.  <u>See</u>, <u>e.g.</u>, <u>United States v. Prior</u>, 546 F.2d 1254, 1259 (5th Cir. 1977) ("[N]umerous cases have ruled that the government is not obliged under <u>Brady</u> to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.").  Moreover, if Petitioner had been with Edenfield on the night in question, there was nothing that prevented him from informing the Commonwealth well in advance of trial that she would be an alibi witness.  It was his fault that the jury did not hear her testimony, not the Commonwealth's fault.  Finally, considering the overwhelming evidence of Petitioner's guilt; that he gave the police, his supervisor, and a coworker an entirely different story about where he was on the evening of February 15, 2001, and why he was late for work that night; that Edenfield could not recall the exact date she allegedly met Petitioner; that her bank records, the cab company records, and Edwards's and Shippling's statements do not show that she was with Petitioner on February 15, 2001 – the Court concludes that the absence of Edenfield's testimony was not material to the defense.  There was no <u>Brady</u> violation and the Superior Court's denial of this claim will not be disturbed by this Court.

### (c)

Petitioner's final claim is that Richmond and Murphy, who represented him until about August 22, 2001, deprived him of his Sixth Amendment right to effective counsel because they did not investigate alibi witnesses and failed to file a notice of alibi.  Petitioner contends that he

---

[16]  The Superior Court also determined in the alternative that Petitioner waived his <u>Brady</u> claim because he could have, but did not, raise it on direct appeal.  42 PA.CONS.STAT.ANN. § 9544(b).  Petitioner counters that, despite his best efforts, he was unable to secure the police report and bank records until after his direct appeal had concluded and therefore he could not have raised the <u>Brady</u> claim any earlier.  Because Petitioner's claim fails on the merits, this Court need not decided if it is also procedurally defaulted.

told Richmond that George Lyons and Edenfield could verify his whereabouts on the night of M.R.'s kidnapping, but that counsel did not investigate.

The Superior Court adjudicated this claim in Lyons 2. It denied the claim because Petitioner chose to represent himself at trial and he had ample opportunity to file a Rule 573 notice of alibi himself and failed to do so. Thus, he may not avoid the consequences of his own inaction by claiming ineffectiveness on the part of the counsel he dismissed well before trial. (SCR No. 161, Lyons 2, No. 1101 WDA 2006, slip op. at 6-8). The Superior Court's adjudication was not "contrary to" or an "unreasonable application of" clearly established Federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court held that in order to establish that counsel's service was constitutionally deficient, a petitioner must demonstrate: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced the defense. The prejudice prong requires Petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Here, Petitioner cannot show that he was prejudiced by his pretrial counsels' alleged ineffectiveness. After Petitioner dismissed them, he had the opportunity to file a notice of alibi defense and he did not. The failure to file a timely notice of alibi defense and to investigate alibi witnesses falls squarely on his shoulders. As the Superior Court observed, "[a] criminal defendant who knowingly and intelligently waives his right to counsel so that he may represent himself at trial may not later rely upon his own lack of legal expertise as a ground for a new trial." (SCR No. 161, Lyons 2, No. 1101 WDA 2006, slip op. at 7 (quoting Commonwealth v. Bryant, 855 A.2d 726 (Pa. 2004), which cited Faretta v. California, 422 U.S. 806, 834 n.46 (1975)).

Finally, Petitioner cannot show any prejudice because he has not demonstrated that either George Lyons or Edenfield could have provided him with an alibi. Edenfield did not know for sure what night she met Petitioner at the Lyons Den. And, it does not appear that Petitioner has

ever presented any evidence to show what favorable testimony George Lyons could have provided.  Petitioner wants this Court to assume that his uncle would have testified that he was at the Lyons Den the night of February 15, 2001, but he has not submitted any evidence to support that assumption.

###### C.     Certificate of Appealability

_____It is recommended that a certificate of appealability be granted with respect to Petitioner's Confrontation Claim as it pertains to his conviction of making terroristic threats.  A certificate of appealability should be denied in all other respects.

### III.    CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a limited certificate of appealability be granted.  Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, Petitioner is allowed to file objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.  Failure to file timely objections may constitute a waiver of any appellate rights.  See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter_____
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated:  February 9, 2010
cc:     The Honorable Sean J. McLaughlin